KLABUNDE, Respondent, v. EMERLING, Appellant.

*November 2—December 1, 1959.*

For the appellant there was a brief by *Cavanagh, Mittelstaed, Sheldon, Heide & Hartley* of Kenosha, and oral argument by *William A. Sheldon.*

For the respondent there was a brief by *Foley, Capwell, Duersten & Foley* of Racine, and *Morrissy, Morrissy, Zastrow & Sweet* of Elkhorn, and oral argument by *Rex Capwell* and *Richard F. Foltz* of Racine.

DIETERICH, J. The accident occurred on Highway 50, a short distance east of the Soo Line overhead, in Kenosha county. The plaintiff, Klabunde, was driving alone in an easterly direction. The defendant, Emerling, was operating his car in a westbound direction on Highway 50, accompanied by his wife and four children. He was followed by a car owned and operated by Thornton. Both cars were on their way from Chicago to Mr. Emerling's summer cottage at Honey lake. The accident occurred at approximately midnight, July 2, 1955.

The jury's verdict in this case found that Emerling was causally negligent with respect to failing to pass the plain-

tiff's car to the right, giving the plaintiff's car at least one half of the main-traveled portion of the roadway as nearly as possible, and found no negligence against the plaintiff, and assessed the plaintiff's damages for personal injuries at $2,000.

The issue in this case is whether Howard C. Klabunde, plaintiff, had testimonial capacity. The principal argument of the defendant is that the cross-examination of Klabunde elicited answers from him which as a matter of law made his answers on direct examination incredible, and then urges that the only evidence on the part of the plaintiff is the inference which arises from his direct testimony, and that the cross-examination destroyed his direct examination, and entitled defendant to dismissal of plaintiff's complaint.

### Direct Examination of Klabunde.

"Q. At what speed were you going? A. Approximately 45 to 50 miles an hour. . . .

"Q. After passing the Soo Line overhead about how far were you from the vehicle driven by Mr. Emerling when you first observed it? A. Approximately 700 feet. . . .

"Q. Were your lights on? A. Yes.

"Q. Bright or dim? A. Dim. . . .

"Q. Would you describe where your vehicle was with respect to the side of the road on the right at that time? A. Approximately two to three inches from the side of the road. . . .

"Q. And would you describe where with respect to the right shoulder of the highway your vehicle was at the time of the impact between the two cars? A. Approximately two to three inches from the side of the road.

"Q. Approximately how far had your car gone from the time you first observed the Emerling car to the time of the impact? A. Approximately 300 feet.

"Q. And would you describe to the jury during the course of that 300 feet of travel after you first observed the Emerling car where the right wheels of your car were with re-

spect to the shoulder of the highway? *A*. Approximately two to three inches from the side.

"*Q*. Do you recall the impact? *A*. Yes.

"*Q*. Would you tell the jury what you recall happened just before the impact? *A*. I just heard the brakes squealing and that's all.

"*Q*. Were you rendered unconscious? *A*. No, but I was dazed.

"*Q*. Do you recall any of the events following the accident such as the location of the cars? *A*. No, I don't.

"*Q*. What is the first thing you recall? *A*. Being in the hospital.

### Cross-examination of Klabunde.

"*Q*. Do you have any independent recollection, all your own, as to what occurred from the time you first saw the Emerling car until you lost consciousness as you said? *A*. Just that there was a collision.

"*Q*. And that's all you remember? *A*. Yes.

"*Q*. And isn't it true the last memory you had was that your car was on the right-hand side of the road with the right wheels about two or three inches from the right of road? *A*. Yes.

"*Q*. And that is the last memory you have in that 300 feet, is that right? *A*. Yes.

"*Q*. Isn't it a fact you went to sleep? *A*. No. . . .

"*Q*. What kind of a night was it? *A*. A clear night.

"*Q*. Were the roads dry? *A*. Yes, they were. . . .

"*Q*. Was there any other traffic ahead of you? *A*. No.

"*Q*. Was there any other traffic going west? *A*. Just the Emerling car is all. . . .

"*Q*. The fact is there was a bend in the road to your right? *A*. Yes.

"*Q*. And where with respect to the bend in that road did the impact occur,—was it at the east or west portion of that curve? *A*. More to the west part of the curve.

"*Q*. In other words, you were just getting to the curve? *A*. No, I was in the curve.

"*Q*. But at the west part of the curve? *A*. Yes. . . .

"*Q*. The last memory you have is when the Emerling car and you were 700 feet apart, is that right? *A*. No.

"*Q.* Did you see the Emerling car at the moment of the impact? *A.* No.

"*Q.* Did you see it the second before the impact? *A.* Yes.

"*Q.* Where was it then? *A.* I just seen the lights; I wasn't looking straight at it.

*Redirect Examination of Klabunde.*

"*Q.* Immediately prior to the impact do you recall hearing anything? *A.* Yes.

"*Q.* And what did you hear? *A.* Tires squealing.

"*Q.* And whose tires were they? *A.* The other car."

In 98 C. J. S., Witnesses, p. 128, sec. 375, it is stated:

". . . the mere fact that a witness' testimony may be shaken on cross-examination does not, as a matter of law, remove from the jury's consideration all the testimony of such witness, and although the cross-examination may weaken his evidence on a particular issue, it will not justify a holding that the witness gave no substantial evidence on the issue where different conclusions can fairly be drawn from his evidence in its entirety."

Arnold Emerling, defendant, testified that he was driving his automobile on the night of the accident on Highway 50 in Kenosha county. That the passengers in his car consisted of his wife, two sons, and one daughter, and that they were going to their summer cottage at Honey lake. That the Thornton car was probably 200 feet behind him and that the occupants of that car were his niece and her husband-to-be, a friend and his wife. That his headlights were set on dim and that when he first observed the Klabunde car it was coming around the curve and that Klabunde was on his own side of the road. He was asked:

"*Q.* Where were you with respect to the west limit of the curve at the moment of impact? *A.* I was at the extreme west end of it.

"*Q.* What side of the road were you on? *A.* My own side. . . .

"*Q.* What part of your car and what part of the Klabunde car came in contact? *A.* He hit the left front fender and bumper. . . .

"*Q.* Did you discuss the trial of this accident with any of the persons that accompanied you from Chicago today following the trial of your own case? *A.* I wouldn't say we discussed it, but we talked. After all when five members of the family are hurt you talk about it.

"*Q.* And you did discuss it with your representative prior to this trial? *A.* Yes.

"*Q.* And at that time were you alone? *A.* No, all together . . . except Mr. Rae."

Mrs. Bernadine Emerling, the wife of defendant, testified.

Dorothy Thornton testified on behalf of the defendant, and stated they were following the Emerling car and that her husband, Ronald Thornton, was driving. That she was seated in the front seat next to the driver, and that their car was 200 feet behind the Emerling car. She was asked:

"*Q.* Did you see the Klabunde car immediately before the impact? *A.* Yes. I screamed before the impact and I knew Mr. Emerling couldn't get out of the way. From where I was sitting it looked like he came straight into Mr. Emerling."

Donald W. Rae, a passenger in the Thornton car, testified that he was in the rear seat, but asleep. Then he was asked:

"*Q.* What awakened you? *A.* I heard Mrs. Thornton scream and I heard a collision."

Mrs. Alice Rae testified that she was in the Thornton car and that she was asleep. She was asked:

"*Q.* Were you awakened by the collision? *A.* Yes, by Mrs. Thornton's screaming. . . .

"*Q.* Did you actually see the collision? *A.* No."

The witnesses for the defendant were, in all except one instance, related to him, and Mrs. Thornton, the exception, was admittedly a friend of the family. The occupants of the Emerling car and the Thornton car were planning on spending the weekend together.

The plaintiff established his claim by stating on direct examination that he was 700 feet from the defendant when he first observed the defendant's car, and that at that time the plaintiff's car was two or three inches from the right edge of the road and that his car was in the same position with relation to his own right edge of the road at the moment of impact. He further testified that he traveled 300 feet after first seeing the defendant's car and that during that time the right wheels of his car remained not more than two or three inches from the edge or side of the road.

On cross-examination Klabunde was asked if he had an independent recollection of his own as to what occurred from the time he first saw the defendant's car until he lost consciousness. The record shows that he never testified he lost consciousness. He stated he was dazed, and his answer was, "just that there was a collision." This was followed by the question: "And that is all you remember?" and his answer: "Yes." The two questions must be considered together and the jury had the right to infer, and the witness may have so inferred, that he was simply asked the question what he remembered as occurring in the last 300 feet as distinguished from the question of the position of his car on the highway. Then the question was asked of the plaintiff:

"*Q*. And isn't it true the last memory you had was that your car was on the right-hand side of the road with the right wheels about two or three inches from the right of the road? *A*. Yes.

"*Q*. And that is the last memory you have in that 300 feet, is that right? *A*. Yes."

The defendant interprets these answers to mean that the plaintiff had a memory when he first saw the defendant's car and there was 700 feet between them, and the defendant interprets the testimony to further say that while the plaintiff at that moment had a recollection that he was two or three inches from the right edge of the road, he has no memory of where he was as he traveled the 300 feet to the point of impact.

While this might have been an inference to be drawn, it is certainly not the only possible inference because both the witness and the jury might have understood the question to be about the memory in that 300 feet, and it is our opinion that the witness so understood the question and that interpretation is perfectly consistent with his direct examination wherein he testified as to the position of his car during that 300 feet.

The inference upon which the defendant relies or the inferences arising from the direct examination did not create a question of law for the court to decide. It was purely a question for the jury whom to believe and what version of the story to believe.

The trial court stated in its memorandum decision that the issue in this case would necessarily have to turn upon the question of credibility of witnesses, and that there had to be negligence upon either the plaintiff or the defendant or both. The collision could not have been accidental. One of the parties or both had to have invaded the lane of the other or otherwise the collision would never have occurred. In this we concur.

In *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 109, 62 N. W. (2d) 549, 63 N. W. (2d) 740, it is stated:

"It is the well-recognized rule that when a jury's findings are attacked, particularly when they have had the trial court's approval, our inquiry is limited to the issue whether there is any credible evidence that, under any reasonable view, supports such findings."

We find that there is credible evidence to sustain the jury's findings.

*By the Court.*—Judgment affirmed.